

Steven A. Goldfarb

Direct Phone: 216.274.2314
Direct Fax: 216.274.2514
Email: sagoldfarb@hahnlaw.com

April 17, 2024

**VIA ECF Filing**

Honorable Rukhsanah L. Singh, U.S. Magistrate Judge
United States District Court of New Jersey
Clarkson S. Fisher Building and U.S. Courthouse
402 East State Street
Trenton, NJ 08608

    **Re:**    **His All Holiness Bartholomew I, etc., et al., Princeton University, D.N.J. Civil
Action No. 3:18-cv-17195-RK-DEA**

Dear Judge Singh:

Defendant, the Trustees of Princeton University ("<u>Princeton</u>"), writes pursuant to Local Rule 37.1(a) in connection with several outstanding discovery disputes between Princeton and Plaintiffs, His All Holiness Bartholomew I, the Archbishop of Constantinople, New Rome, and Ecumenical Patriarch ("<u>Patriarch</u>"), The Holy Metropolis of Drama ("<u>Metropolis</u>"), and the Monastery of Theotokos Eikosiphoinissa ("<u>Monastery</u>" and collectively "<u>Plaintiffs</u>").[1]

Following a telephonic conference between the parties, and a joint status report to the Court on March 22, 2024, the parties were permitted to present their discovery issues through letter-brief. [ECF No. 150.] The parties then held a further meet-and-confer and were able to resolve several discovery disputes. Hence, there only remain two issues for the Court to address:

    (1) Princeton's Request for Sanctions/Evidentiary Relief for Plaintiffs' Failure to Produce Prof. George Papazoglou as Ordered by this Court [ECF No. 101]; and

---

[1] The Ecumenical Patriarch is the leader of the Eastern Orthodox Church. Based in Istanbul, Turkey, he has direct ecclesiastic jurisdiction over certain regional Greek Orthodox "Metropolises." The Metropolis of Drama, led by the Metropolitan of Drama, is one such metropolis. The Monastery is an ecclesiastical entity within the Metropolis, run by the senior nun called the Abbess. The Monastery falls under the direct ecclesiastic authority of the Patriarch, but is supervised at his direction by the Metropolitan of Drama.



Honorable Rukhsanah L. Singh
U.S. Magistrate Judge
April 17, 2024
Page 2

    (2) Princeton's Request for an Order Compelling Plaintiffs to Produce Documents Provided by Papazoglou in 1989 to Dionysios, the Metropolitan of Drama, from 1965-2005, as Referenced in Bates Label PAT0000081 ("30 Year Email").

These disputes largely relate to a single, overarching question:

> Whether the Court should issue evidentiary sanctions precluding Plaintiffs from offering any evidence or argument contrary to the fact that, between 1986 and 1998, Professor George Papazoglou provided information to Metropolitan Dionysios and Abbess Alexia expressly detailing Princeton's possession of the manuscripts which Plaintiffs now claim were stolen from the Monastery's library in March of 1917?

As detailed below, the requested evidentiary sanctions are appropriate because Metropolitan Dionysius wrote and published, in 1995 a book about the Monastery's history clearly recognizing that Princeton was in possession of the manuscripts at issue in this case—rendering Plaintiffs' claims time-barred. Metropolitan Dionysos reached this conclusion, in part, because he obtained documents from Papazoglou in or around 1989, and cited to works by Papazoglou during the 1980s and 1993, which themselves acknowledge Princeton's possession.

On May 21, 2021, Princeton commenced the 30(b)(6) deposition of the Metropolis whose witness was Dionysios' successor, Metropolitan Pavlos, who was Metropolitan of Drama from 2005 until his death on May 2, 2022. Metropolitan Pavlos was asked about the 1995 book and the communications between Papazoglou and Metropolitan Dionysios in the 1980s and 1990s (including the documents sent by Papazoglou to Dionysios circa 1989), but Metropolitan Pavlos was unable to substantively answer any questions, because (a) Dionysios died in 2005, and (b) Pavlos was directed by counsel not to speak with anyone, including Papazoglou, to prepare for his deposition. As a result, Princeton postponed the remainder of the deposition, and for over a year, sought to remedy Pavlos' intentional unpreparedness as part of various discovery disputes pending before Magistrate Judge Arpert.  However, as noted above, Metropolitan Pavlos passed away May 2, 2022, which mooted the dispute relating to the second day of his deposition.[2]

For multiple reasons, including Plaintiffs' baseless position that Dionysios' books neither establish his knowledge of the Princeton possession of the at-issue manuscripts nor that Dionysios' knowledge came from Papazoglou, Princeton sought Papazoglou's deposition and the documents provided by him to Dionysios in and around 1989. Plaintiffs did not produce these documents and, following a Court order, failed to produce Papazoglou for deposition.

_____

[2] *See* ECF No. 75 at 21.

15487470.v7



Honorable Rukhsanah L. Singh
U.S. Magistrate Judge
April 17, 2024
Page 3

## I.     Pertinent Facts and Background

### A.     General Litigation Background

Since Your Honor is new to the case, Princeton offers the following summary of relevant facts and the history of this litigation to put the discovery disputes into proper context:

***First***, the following key facts are undisputed:

- In 1885, hundreds of ancient religious manuscripts were located in the library of the Monastery (then known as the "Kosinitza" Monastery) when a well-known academic catalogued and published an inventory of the Monastery's holdings ("Kerameus Inventory"). [ECF No. 1 at ¶20]

- In March 1917, during World War I, a large number of the Monastery's manuscripts were stolen during a raid by a Bulgarian militia led by Vladimar Sis, a Balkan historian and war correspondent, who prepared his own inventory of the manuscripts taken from the Kosinitza Monastery (the "Sis Inventory").

- The manuscripts allegedly identified in the Kerameus Inventory as "Kosinitza 32" and "Kosinitza 112," which were not listed in the Sis Inventory, were offered for sale in a 1920 catalogue of a bookseller in Germany named Joseph Baer & Co. ("Baer").

- A manuscript collector, and Princeton alum and trustee, named Robert Garrett, purchased Kosinitza 32 and 112 from Baer in the 1920s and donated them to Princeton in 1942, whereinafter they were labeled as "Garrett MS. 14" (*i.e.,* Kosinitza 32), "Garrett MS. 16" and "Garrett 16A" (together, Kosinitza 112).

- Princeton purchased a manuscript directly from Baer in 1924 and labeled that manuscript as "Princeton MS. 81."

***Second,*** Plaintiffs filed their Complaint on December 13, 2018, alleging joint ownership and right to possession of Garrett MS. 14, 16, 16A, and Princeton MS. 81 (the "Princeton Manuscripts"). [ECF No. 1 at ¶¶1, 7, 14.] Plaintiffs' claims are based upon their allegation that the Princeton Manuscripts (then known as Kosinitza 32 & 112[3]) were still "housed" at the Monastery's library

---

[3] Manuscript Nos. "32" and "112" are alleged by Plaintiffs to be the same as three, and possibly all four of the Princeton Manuscripts. [*See* ECF No. 1 at ¶21.]



in 1917 when they were stolen in the Bulgarian raid led by Sis. For several reasons, including the fact that these manuscripts were not listed in the Sis Inventory, Princeton's position is that Plaintiffs cannot prove the Princeton Manuscripts were stolen from the Monastery ("1917 Ownership Issue").

**Third**, Princeton's primary defenses are that (a) Plaintiffs cannot prevail on the 1917 Ownership Issue because there is insufficient evidence to establish that the Princeton Manuscripts were stolen from the Monastery in 1917, and; (b) even if there were sufficient evidence to carry Plaintiffs' burden to prove such theft (there is not), Princeton acquired the manuscripts in good faith and **Plaintiffs**, as they reasonably should have, ***actually discovered Princeton's possession of the Princeton Manuscripts more than two decades before filing this lawsuit***, such that their claims are barred by the six-year statute of limitations (N.J. Stat. Ann. § 2A:14-1); and, alternatively, (c) Plaintiffs' claims are barred under the doctrine of laches due to their delay in bringing this lawsuit.

**Fourth**, at all times, Princeton, and Robert Garrett before his donation, have openly possessed the manuscripts. Any reasonable search for the Princeton Manuscripts, including throughout the 1960s, 1970s, 1980s, 1990s, and 2000's, would have readily disclosed that Princeton possessed the Princeton Manuscripts. For example, in the 1980s, a Greek academic named Professor George Papazoglou was conducting research regarding the location of the manuscripts stolen in 1917 and, through simple library research, he easily identified the location of many Kozinitza manuscripts, including the Princeton Manuscripts. [ECF No. 75-6* at 3-4, fn. 3 & 75-7* at 2.][4] Papazoglou's published research from 1986-1993 substantiated his conclusions regarding the Princeton Manuscripts by citing to a 1958 catalogue of Greek manuscripts by Marcel Richard, who relied upon citations to multiple publications dating back to the 1920s. *See, e.g.*, ECF No. 75-7* at 2, fn. 6. (*The Manuscripts and Libraries of Eastern Macedonia and Thrace,* George Papazoglou (1993); Exh. A* (*Directory of Libraries and Catalogues of Greek Manuscripts*, Marcel Richard (1958) at p. 2.)

**Fifth**, during discovery, Plaintiffs disclosed that Metropolitan Dionysios, from 1965-2005, was given the responsibility of "revitalizing" the Monastery's efforts "to search for the manuscripts stolen from the Monastery in 1917." [ECF No. 75-1 & 75-2 at 7–8.] Plaintiffs then belatedly disclosed that, in 1995, Dionysios published a book ("1995 Book") evidencing Plaintiffs' knowledge that the Princeton Manuscripts were in Princeton's possession. The following is the key translated excerpt from the 1995 Book:

---

[4] Where an "*" appears, the evidence was submitted in translated form to the Court. For those Exhibits ("Exh.") that are not part of the ECF record, translated versions are appended to the original, and concurrently filed herewith.
15487470.v7



> [Some manuscripts seem]to have been appropriated by Vladimir Sis and other Bulgarian individuals. One is in the Library of Cyril and Methodius (Sofia), some are kept in the Library of the Institute of Ecclesiastical History (Sofia), while many passed into the hands of individuals who sold them     [continued on next page]
> as and where they could. Indicatively we mention the following[26] by choice: Much earlier several of the manuscripts of Eikosifoinissi are found in bookstores of Central Europe. Three of them are owned in 1920 by Joseph Baer (Frankfurt). The no. 32 and 112 were sold in 1924 and are now in the Princeton University Library, the 124 is in the Theological Library of the Evangelical Church in Maywood, the 93 and the 202 are in Upsala, the 60 in Durham South Carolina, 46 pages of manuscript 53 in the Pierpont-Morgan Library in New York, the 374 in the Cambridge Library. Other manuscripts are also found in Brussels, Vienna, Amsterdam, Prague, Bratislava and elsewhere[27].
>
> _____
>
> 26. Based on the relevant announcement of Professor Georgios K. Papazoglou at the B' Symposium "Kavala and its area" (Kavala 26-29 September 1986), Proceedings (Kavala 1987), A, pp. 53-56. Republished in "Manuscripts and Libraries of Eastern Macedonia and Thrace", volume A, Komotini 1993.

[ECF No. 75-2 at 10–11; ECF No. 75-10* at 6-7].

**Sixth**, contradicting the evidence of Plaintiffs' actual knowledge of the Princeton Manuscripts by at least 1995, Plaintiffs responded to interrogatories by claiming that they did not learn of Princeton's possession until "March 2013," following an investigation led by their counsel. [ECF No. 75-1 & 75-2 at pp. 10–11.] Plaintiffs ironically assert that counsel's investigation, which consisted of speaking to Papazoglou (who had been assisting Metropolitan Pavlos), and Papazoglou, in turn, provided counsel with documents showing the Princeton Manuscripts were possessed by Princeton. [ECF No. 75-1 & 75-2 at 10–11.] Plaintiffs did not identify Papazoglou as a person with knowledge of any facts in their initial disclosures. Rather, Plaintiffs merely characterized Papazoglou as their "non-testifying expert." [*Id*.] [ECF No. 75-1 & 75-2 at 10–11.]

**Seventh**, upon learning these facts, in November 2019, Princeton noticed the deposition of the Patriarch, individually, and the Metropolis and the Monastery under Rule 30(b)(6). Princeton did so, primarily, to discover facts surrounding its primary defenses, including eliciting information establishing that Plaintiffs knew their claims were time-barred long before they filed this lawsuit.



Honorable Rukhsanah L. Singh
U.S. Magistrate Judge
April 17, 2024
Page 6

***Finally,*** in an effort to avoid the depositions of the Patriarch and the Metropolis on these statute of limitation issues, Plaintiffs quickly moved to dismiss both of those plaintiffs from the case. [ECF No. 30.] Princeton opposed that motion because it was a transparent effort to prevent key depositions of the Patriarch and the Metropolis, who have the power and authority to supervise and act on behalf of the Monastery as to all relevant matters, including the Princeton Manuscripts. [ECF No. 38.] On July 23, 2020, Judge Shipp agreed with Princeton that Plaintiffs' attempt to orchestrate the litigation through the Monastery, while shielding themselves from the most relevant discovery, was prejudicial. [ECF No. 44]. The Court then conditioned dismissal of the Patriarch and the Metropolis on the completion of pending discovery directed to each of them—which remains ongoing. [*Id*. at 6–7.]

### B.    Relevant Facts Pertaining to Professor George Papazoglou and Plaintiffs' Shielding of Papazoglou from Princeton

#### 1.    Discovery Reveals that Papazoglou is a Critical Fact-Witness

In May of 2021, Princeton took the deposition of the Monastery's 30(b)(6) witness. Princeton then began the deposition of the Metropolis' 30(b)(6) witness, Metropolitan Pavlos.[5] Princeton had to adjourn that deposition prematurely when, *inter alia*, it learned that Metropolitan Pavlos had been instructed by counsel not to fully educate himself on the Metropolis' knowledge, including the Metropolis' communications with key witnesses—including Papazoglou.

Collectively, the depositions of the Monastery and Metropolis revealed a host of new discovery issues, including—for the first time—the need for the deposition of Papazoglou.

***First***, it became apparent that, in the late 1980s/early 1990s, the Metropolis and Monastery learned from Papazoglou that Princeton possessed the Princeton Manuscripts. Papazoglou—a Greek academic who focuses on the 1917 theft—conducted basic library research on the removal of artifacts from the Monastery in 1917. Without any real evidence, Papazoglou adopted the unsupported conjecture of a German researcher who published a half-page note in a 1921 German periodical concluding that the Princeton Manuscripts were probably among the manuscripts taken during the 1917 raid.[6] Papazoglou then adopted this conjecture as fact in a 1986 presentation titled

---

[5] Metropolitan Pavlos subsequently passed away in May 2022.

[6] The author of this note, Paul Maas, was actually informed by Baer (the bookseller) that the manuscripts were not stolen and were instead acquired from the estate of a Turkish man, yet his note went on to suggest—without explanation—that they were "probably" stolen from the Monastery during the Balkan Wars. [ECF No. 75-8*.]



*The Manuscripts of Eikosiphoinissa*, and in two books from the 1990s, *Manuscripts of Eikosiphoinissa* (1991) and *Libraries and Manuscripts of Eastern Macedonia and Thrace* (1993). [ECF No. 75-6* at 4, fn. 3; ECF No. 75-7* at 3.]

**Second**, Princeton discovered that Papazoglou likely contemporaneously reported his findings to the head of the Monastery, Abbess Alexia, and the head of the Metropolis at the time, Metropolitan Dionysios—who, as detailed above, was put in charge of locating the Princeton Manuscripts on the Monastery's behalf. [ECF No. 75-3 at 78:23–79:9; 135:14–137:8; 138:24–139:6.] Dionysios's awareness of Papazoglou's conclusions is known because Dionysios and the Monastery published their own books in 1991 (Dionysios), 1995 (Dionysios), and 1998 (Monastery), which cited to Papazoglou's publications. [ECF No. 75-9* at 6, 8; ECF No. 75-10* at 6-7, fn. 26.] Indeed, as excerpted *supra*, Dionysios specifically cited to Papazoglou in the 1995 Book to support his assertion that the Princeton Manuscripts were stolen from the Monastery in 1917 and located at Princeton. [*Id.*] Similarly, Dionysios' 1991 book and the Monastery's 1998 book, the latter of which was written by Dionysios and published by the Monastery, and which had been continually updated and distributed to the Monastery's visitors for decades, stated that manuscripts stolen from the Monastery were confirmed to be located in certain libraries in the United States. [ECF No. 75-9* at 6.] Both cite to Papazoglou's publications which, naturally, identify Princeton as possessing the Princeton Manuscripts.

**Third**, Princeton also became aware of the Monastery's and Metropolis's knowledge of Papazoglou's findings through an April 20, 2019, e-mail produced by Plaintiffs. In this e-mail from Papazoglou to Metropolitan Pavlos, Papazoglou refers to certain documents he provided to Dionysios "30 years ago"—*i.e.*, circa 1989—which had been found in an envelope in Dionysios' room. ("30 Year Email"). [ECF No. 109-2 at 34*.][7] Papazoglou went on to express his concern with providing these documents to Princeton. [*Id.*]

**Fourth**, at deposition of the Metropolis, Princeton asked targeted questions about the communications between Dionysios and Papazoglou in the 1980s and 1990s, as well as the documents referenced in the 30 Year Email. Metropolitan Pavlos confessed that he could learn this information by asking Papazoglou. [ECF No. 75-5 at 94:9-15.] However, he had been instructed not to prepare for deposition by speaking to anyone, including Papazoglou, in order to educate himself, including on the conversations between Papazoglou and Dionysios, and the documents from the 30 Year Email. [*Id.* at 80:5-11.]

**Fifth**, discovery revealed that in 1995, Papazoglou hosted a major two-day conference titled *Recovery of Artifacts Stolen from Eikosiphoinissa*. [ECF No. 75-11*.] During Papazoglou's speech

---

[7]  Plaintiffs attempted to claw this document back. The Court rejected that attempt. [ECF No. 101 at 7.]



at the conference—which was later published in a book by Papazoglou—he remarked that "nothing could be done to prove" that certain manuscripts, including the Princeton Manuscripts, were stolen from the Monastery in 1917. [*Id*. at 7.] This conference, attended by the former President of Greece, concluded with a "guided" tour of the Monastery. [*Id*. at 5, 6.]

***Sixth***, for unknown reasons, Plaintiffs decided not to inform Princeton or promptly bring a claim against Princeton in the 1980s or 1990s. Rather, Plaintiffs waited until more than a decade after Dionysios's death to pursue an action against Princeton. [ECF No. 1.] Consequently, Papazoglou is now ***the only known living person with personal information*** about his interactions with, and the knowledge of, the Monastery's and Metropolis's representatives in the 1980s and 1990s. Every other known witness has since passed away; Metropolitan Dionysios died in 2005, and both Abbess Alexia and Metropolitan Pavlos passed away in 2022.[8] [ECF No. 98.]

***Finally***, Plaintiffs have since conceded that Papazoglou's knowledge "became the core of Plaintiffs' factual allegations in this lawsuit." [ECF No. 74 at 9.] This includes having relied on Papazoglou in formulating their discovery responses. [ECF No. 101 at 6; ECF 75-5 at 83:1–9.]

In summation, it became clear through discovery that Papazoglou is more than just a "non-testifying expert"—he is the most critical, living witness to the most important defense issues in this litigation. His unique knowledge has been used to prosecute this case against Princeton, while Plaintiffs, as detailed below, have sought to shield him from Princeton's reach.

> ## 2. The Court Orders Plaintiffs to Produce Papazoglou for Deposition and Plaintiffs Fail to Produce Him

On May 6, 2021, immediately after Princeton first learned that Papazoglou is a key fact witness, Princeton noticed Papazoglou's remote deposition as Plaintiffs' agent.[9] Rather than cooperate in making Papazoglou available for remote deposition, however, Plaintiffs objected that they had no obligation to present Papazoglou for deposition and, instead claimed that Princeton had to go through the time-consuming, ineffective, expensive, and logistically difficult Hague Convention to obtain information from Prof. Papazoglou. [ECF No. 101 at 6.]

---

[8] Princeton sought the deposition of both witnesses. Plaintiffs moved to quash the former, and the latter had to be adjourned due to the aforementioned unpreparedness.

[9] Princeton noticed Papazoglou's deposition immediately following the conclusion of the Monastery's May 5-6, 2021, deposition, two weeks prior to the Metropolis' May 21, 2021, deposition.



Following comprehensive letter-briefing and a lengthy hearing, the Court (Magistrate Judge Arpert then-presiding) held that "[d]ue to the amount of time that has passed and the loss of other witnesses, the Professor appears to be the only person with relevant information regarding his interactions many years ago with the Monastery." [ECF No. 101 at 5.] The Court then found that "exceptional circumstances" existed under Fed. R. Civ. P. 26(b)(4)(D)(ii) to permit the deposition and acknowledged that "the Professor has provided assistance to Plaintiffs with discovery" and has "worked with Plaintiffs prior to and during this action." [*Id*. at 6.] The Court concluded that the evidence demonstrated that Plaintiffs exercise sufficient control over Papazoglou to be able to produce him. [*Id*. at 6-7; *see also* ECF No. 122 at 5; ECF No. 135 at 7.] Accordingly, the Court ordered "Plaintiffs to produce [Papazoglou] for a deposition." [ECF No. 101 at 7.]

Over the course of nearly a year, Plaintiffs appealed this order, then moved for reconsideration—both times unsuccessfully. [ECF Nos. 122, 135.] In doing so, the District Court recognized that the order requiring Plaintiffs to produce Papazoglou for deposition was factually sound, and legally correct. [ECF No. 122 at 7.] Presciently, the District Court foreshadowed the consequence of non-compliance with the order, and recognized that the order appropriately "ensure[d] that ***any potential penalty for noncompliance would fall on Plaintiffs***, the party to the litigation, and not [Papazoglou]." [ECF No. 122 at 8] (emphasis added). The Court further warned that "the longer the deposition of [Papazoglou] is delayed, the greater the likelihood that [his] unique knowledge about this case, which will likely turn on decades-old events, may disappear." [ECF No. 135 at 7.]

On January 22, 2024, Princeton re-noticed the remote deposition of Papazoglou. [Exh. B (Notice of Deposition).] Despite the Court's order, Plaintiffs failed to produce Papazoglou for deposition. [Exh. C (email confirming non-appearance).] Evidently, Plaintiffs' efforts to produce Papazoglou consisted of a single official from the "Patriarchal office" asking him to appear. [*Id*.] None of the Plaintiffs, including the Patriarch, the Metropolitan, or anyone from the Monastery, apparently even personally reached out to Papazoglou.

### 3. Plaintiffs Will Not Produce Papazoglou Because His Testimony Will Further Eviscerate Their Specious "Discovery Rule" Theory

In shielding Papazoglou from deposition, and despite the irrefutable evidence that Plaintiffs actually discovered Princeton's possession of the Princeton Manuscripts not later than the 1990s, Plaintiffs have sought to concoct a set of facts whereby they did not discover, and could not reasonably have discovered, Princeton's possession prior to December 12, 2012 (*i.e.,* six years prior to filing suit). Specifically, Plaintiffs claim that they were only able to learn of Princeton's possession in "March 2013" through their counsel's investigation. [ECF No. 75-1 at 10-11.]



In testing this incredible claim, Princeton discovered evidence Plaintiffs were aware, through Papazoglou, of the applicable statute of limitation and related issues. Specifically, Princeton obtained an April 18, 2018, email from Papazoglou to Metropolitan Pavlos, which focused on this case and "the fact that the Monastery has not reacted so far and why the Monastery is reacting today; for this matter, we are trying to say that the monks and the Metropolitan of Drama [Dionysios] weren't obliged or supposed to keep up with the scientific [*i.e.,* academic] bibliography nor did they know where the stolen items were." [ECF No. 77-4* at 3.][10] In other words, Papazoglou, working through counsel, was admitting that Plaintiffs are misrepresenting their knowledge to avoid the statute of limitations defense because he certainly knew that Metropolitan Dionysios was aware of the precise facts "30 years ago," [ECF No. 109-2 at 34*] which he used to write books published in the 1990s, citing to Papazoglou's publications that disclosed Princeton's possession of the Princeton Manuscripts.

It then became obvious that Plaintiffs were withholding evidence and providing evasive discovery responses as part of their efforts to disclaim knowledge of Princeton's possession until March 2013—to construct a "discovery rule" fact-pattern. For example, when Dionysios's 1995 Book was discovered, Plaintiffs unsuccessfully sought to dismiss the Patriarch and the Metropolis, claiming for the first time that only the Monastery owns the manuscripts. [ECF No. 30.] Then, when confronted with the 1995 Book, Plaintiffs provided evasive interrogatory answers which sought to limit their knowledge to the "current Metropolitan"—and to exclude Dionysios' knowledge. [Exh. D (Metropolis' Interrogatory Responses) at Resp. No. 2.] After the Court compelled Plaintiffs to provide a non-evasive response, Plaintiffs stuck by their "March 2013" claim, and reconciled the existence of the 1995 Book by speculating—without evidence— that Dionysios may not have even written his own book. [ECF No. 75-2 at Resp. No. 2.]

This position was both groundless and preposterous *ab intio*, and it has since been further discredited. Setting aside that the 1995 Book clearly evidences authorship by Metropolitan Dionysios, its prologue provides a personal account of his efforts, including the sentence "I wrote the following [book]…" [ECF No. 75-10* at 4-5.] Moreover, the editor of the book has also attested to Dionysios' authorship. [Exh. E* (Evangelos Lekkos Affidavit).]

Plaintiffs have also speculated that even if Dionysios did author the book, this knowledge was personal to him (not as Metropolitan) and, regardless, the knowledge of the Metropolis and the Metropolitan is not attributable to the Monastery. [ECF No. 75-2 at Resp. No. 2; ECF No. 75-12 at Resp. No. 15.] But these specious contentions have also been discredited. Contrary to Plaintiffs' claim, the 1995 Book is copyrighted to the "*Metropolitan* of Drama Dionysios K. Kyratsos." [ECF

---

[10] Plaintiffs claimed this document was protected, but the Court rejected Plaintiffs attempt to claw it back. [ECF No. 101 at 7.]



No. 75-10* at 3] (emphasis added). The Patriarch—via his "representative"—then admitted during deposition that it was Dionysios' duty to take action once he located the Princeton Manuscripts, if he believed them to be stolen. [Exh. F. (Patriarch Representative Depo Excerpts) at 76:7-14; 83:2-83:10; 142:9-12; 145:5-12.] In not doing so in the 1990s, Dionysios' failed in his duties as Metropolitan to the Patriarch and the Monastery; a failure the Patriarch acknowledged in his deposition, characterizing the failure as "tragic." [*Id.* at 118:8-21.]

Finally, Plaintiffs' "discovery rule" fact-pattern was discredited during the Monastery's deposition, when in the middle of the Monastery's deposition, Princeton uncovered that the Monastery ***itself*** published a 1998 book, written with Dionysios, wherein it acknowledged the location of some of its manuscripts in United States libraries, while citing to Papazoglou's publications identifying Princeton's possession. [ECF No. 75-9* at 6-8; ECF No. 75-4 at 7:21–9:7.][11] Critically, Princeton learned that not only had Papazoglou worked with Dionysios, but that he also discussed his research with Abbess Alexia in the 1980s and 1990s. Testimony from Papazoglou regarding these communications would further damage Plaintiffs' "discovery rule" charade. [ECF No. 75-3 at 135:14–137:8; 138:24–139:18.]

## II.     The At-Issue Discovery Disputes

### A.     Princeton's Request for Sanctions/Evidentiary Relief for Plaintiffs' Failure to Produce Prof. George Papazoglou as Ordered by this Court

As detailed above, throughout this case, Plaintiffs have resisted providing, and many times have withheld, evidence from Princeton as to when they learned of Princeton's possession of the Princeton Manuscripts. Indeed, Princeton had to seek Court intervention, just to receive basic, and now known to be incomplete, information about Papazoglou and Dionysios. *See, e.g.,* Exh. G at p. 2 (letter memorializing Court order for Plaintiffs to provide responses to interrogatories that "provide all information about Plaintiffs' . . . consulting experts' (*i.e.,* Papazoglou) efforts to investigate and locate the Manuscripts); *id.* (ordering Plaintiffs to provide interrogatory answer as to when agents of the Metropolis (*i.e.,* Dionysios) first discovered Princeton's possession). Now, after Princeton has uncovered that Papazoglou has harmful information, which can end Plaintiffs' "discovery rule" concoction, and the Court has ordered his deposition—Plaintiffs have not produced him.

---

[11] The Monastery failed to produce, or even acknowledge this book, in response to written discovery. It was only after probing questions during the Monastery's deposition that Plaintiffs acknowledged its existence and produced the 1998 versions of it. Princeton has since learned that there are, at least, editions from 1982, 1994, and 2003, which have also not been produced.



This noncompliance, dating back several years and after several Court hearings, necessitates sanctions. Princeton should not be prejudiced by Plaintiffs' misconduct—especially with regard to this critical witness, with case-dispositive information.[12]

Accordingly, the Court should issue sanctions against Plaintiffs precluding them from introducing evidence and argument contrary to the following fact:

> That between 1986 and 1998[13] Professor George Papazoglou provided information to Abbess Alexia and Metropolitan Dionysios expressly disclosing that Princeton possessed the Princeton Manuscripts.

Here, the Court possesses the authority to impose these sanctions against Plaintiffs under Fed. R. Civ. P. 37. Specifically, Rule 37(b)(2)(A) states, in part, that "[i]f a party ... fails to obey an order to provide or permit discovery ..., the court where the action is pending may issue further just orders" sanctioning the offending party. The Court has "broad discretion regarding the type and degree of sanctions it can impose." *Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.,* 110 F.R.D. 363, 367 (D. Del. 1986) (*citing Nat'l Hockey League,* 427 U.S. at 642). Rule 37(b)(2)(A) specifically provides for several sanctions, including discretion to deem facts as established and to bar evidence. Fed. R. Civ. P. 37(b)(2)(A)(i) & (ii). The sanctions must, however, be determined to be "just and related to the claims at issue." *Wachtel v. Health Net, Inc.* (D.N.J. 2006) 239 F.R.D. 81, 84 (*citing Estate of Spear v. Comm'r of Internal Revenue Serv.,* 41 F.3d 103, 109 (3d Cir. 1994). Here, the requested sanctions satisfy both conditions.

### 1.   The Requested Sanctions are Just

The requested sanctions are just for several reasons. ***First***, Princeton is prejudiced by Plaintiffs' failure to produce Papazoglou for deposition. Papazoglou is the only known living person with personal information about his interactions with the Monastery's and Metropolis's representatives

---

[12] The parties telephonically conferred on this issue twice. Plaintiffs do not believe any sanction is appropriate. Princeton believes a significant sanction is warranted, so no compromise could be reached.

[13] Princeton has chosen 1986 because it is the first date Princeton has discovered that Papazoglou wrote about the location of Monastery manuscripts. The 1998 date is chosen because it is the date the Monastery published its book (or at least the edition produced to Princeton), citing to Papazoglou, acknowledging that manuscripts were in America. Together, the dates also encompass the publication of Dionysios' 1995 Book, citing to Papazoglou, acknowledging Princeton's possession, and those materials identified as having been provided to Dionysios by Papazoglou in the 30 Year Email.



in the 1980s and 1990s. There is evidence that not only did he discuss his research with the Monastery, but he also provided documents to Dionysios during this same period—a time when the Monastery and Dionysios were citing Papazoglou's research into the location of the Princeton Manuscripts. There is further evidence that he has worked with Plaintiffs for decades, knew about the statute of limitation issues, and even represented that "nothing could be done to prove" the Princeton Manuscripts were taken in 1917. Conversely, both before and during this litigation he has worked with Plaintiff and "provided assistance to Plaintiffs with discovery." Indeed, Plaintiffs admit that his work "became the core of Plaintiffs' factual allegations in this lawsuit." [ECF No. 74 at 9.] This includes relying on Papazoglou in formulating their discovery responses—responses which fail to disclose Papazoglou's work with the Plaintiffs in the 1980s and 1990s—and indicate an effort to get around the statute of limitations by intentionally constructing a false "discovery rule" fact-pattern. [ECF No. 101 at 6; ECF No. 75-5 at 83:1–9.] Simply put, Plaintiffs have utilized Papazoglou to prosecute their claims, while concealing from Princeton and the Court his obvious knowledge about the time-barred nature of those same claims.

**Second**, there is no cure for this prejudice. Owing to the death of Dionysios, Abbess Alexia, and Metropolitan Pavlos, there are no other witnesses from whom Princeton can seek this information. And only a live deposition can provide Princeton with direct answers, unfiltered by counsel and Plaintiffs—who have a documented history of withholding evidence from Princeton about the very issues on which Princeton would question Papazoglou.

**Third**, there are indices of willfulness in Plaintiffs' conduct. Plaintiffs have repeatedly withheld evidence, and provided evasive responses about when they learned of Princeton's possession. For instance, upon learning of Dionysios' 1995 Book, Plaintiffs tried to dismiss the Metropolis and Patriarch from the case, knowing that Princeton would likely be unable to obtain non-party discovery from these foreign-located parties. When that did not work, Plaintiffs claimed Dionysios did not author his 1995 Book. Then Plaintiffs said even if he did write it, it was a personal writing, untied to the Metropolis—all facts which have since been discredited. Plaintiffs similarly failed to produce a book published by the Monastery itself in 1998, and written by Dionysios, acknowledging the American location of manuscripts—which cited to Papazoglou's writings, which identified the location of the Princeton Manuscripts. It even took a Court order for Plaintiffs to identify Papazoglou as someone who helped them search for and locate the Princeton Manuscripts. Then, when Princeton discovered his importance as a fact witness being concealed by Plaintiffs under the guise of being their "non-testifying expert", the Court correctly found that Plaintiffs could produce him for deposition if they desired—an order which Plaintiffs disobeyed.

**Finally**, the evidence concealed by not producing Papazoglou for deposition goes to the heart of Princeton's primary defense. Papazoglou can, and undoubtedly would, acknowledge during deposition that he spoke with Abbess Alexia and Metropolitan Dionysios in the 1980s and 1990s



about his research into the location of manuscripts. Papazoglou's deposition would similarly show that he worked with, and provided research information to Dionysios, during this same time period—a fact noted in his 30 Year Email for which he expressed consternation about disclosing. All of this would further establish that Plaintiffs have had actual knowledge of Princeton's possession of the Princeton Manuscripts since at least the 1990s. These facts would put an end to Plaintiffs' preposterous argument that they only learned of Princeton's possession in March 2013—conveniently within the limitations period.

Put another way, to the extent it is not already irrefutable, Papazoglou's testimony would provide Princeton with a final "nail in the coffin" of Plaintiffs' specious statute of limitations defense.

## 2.      The Requested Sanctions are Related to the Claim at Issue

The requested sanctions are related to the particular claim at issue in the Court's order requiring Plaintiffs to produce Papazoglou for deposition. *Estate of Spear*, 41 F.3d at 109. The Court's order, along with the appeal decision, was based on the factual finding that "exceptional circumstances" exist for Papazoglou's deposition because he is the "only person with relevant information regarding his interactions many years ago with the Monastery." [ECF No. 101 at 2-3, 6; ECF No. 122 at 5.]. The order was also based on evidence and argument Princeton presented—much of the same evidence it presents in this letter-brief—that Papazoglou is likely to have information about his interactions in the 1980s and 1990s with Abbess Alexia and Metropolitan Dionysios which informed Plaintiffs at that time of Princeton and other American institutions' possession of manuscripts that allegedly were stolen from the Monastery. [*Id*. at 5; *see also* ECF No. 122 at 3; ECF Nos. 75 at 4-7.]

Here, the requested sanctions are intentionally related solely to the interactions between Papazoglou and Abbess Alexia and Metropolitan Dionysios in the 1980s and 1990s. They apply to facts pertaining to the unique knowledge Papazoglou has about this time-period, what he told them, what he provided them, and how he made them aware of Princeton's possession. These are direct issues that would be addressed at his deposition, and for which he would be forced to provide answers, if Plaintiffs made him available.

Sanctions under Rule 37 are intended "to ensure that a party does not benefit from its failure to comply, and to deter those who might be tempted to such conduct in the absence of such a deterrent." *Starbrite Waterproofing Co., Inc. v. AIM Const. & Contracting Corp.* (S.D.N.Y. 1996) 164 F.R.D. 378, 381 (internal citations omitted). Plaintiffs should not be rewarded for obstructing Princeton's discovery into Papazoglou's critical knowledge and actions.

Accordingly, the Court should award the requested sanctions.

15487470.v7



**B.      Princeton's Request for an Order Compelling Plaintiffs to Produce Documents Provided by Papazoglou in 19189 to Metropolitan Dionysios, as Referenced in Bates Label PAT0000081 ("30 Year Email").**

One of the key-documents in this case is the 30 Year Email, an email from Papazoglou to Metropolitan Pavlos on April 20, 2019, Bates Label PAT0000081. [ECF No. 109-2 at 33-34*.] In this email Papazoglou refers to documents he provided to Dionysios "30 years ago"—*i.e.,* circa 1989—which have been found in an "envelope" in Dionysios' room. Papazoglou goes on to express his concern with providing these documents to Princeton. [*Id.*]

As before, Princeton propounded a document request, and Plaintiffs agreed to produce, "all documents and communications that regard or relate to Princeton's possession of any Manuscript and Plaintiffs' knowledge of such possession." [Exh. H (Plaintiffs' RFP Responses [Set One]) at Resp No. 14, pp. 17-18.] Plaintiffs similarly agreed to produce "all documents and communications that regard or relate to [Plaintiffs'] efforts, or efforts made on [their] behalf, to locate the Manuscripts after March 27, 1917, including, but not limited to, all documents, communications, and research generated in connection with those efforts." [*Id.* at Resp. to RFP No. 1 p. 8.] Plaintiffs identified Papazoglou and Dionysios as being among those people who not only made efforts on their behalf, but also performed research. [ECF No. 75-1 Resp. No. 1, pp. 9-10.]

Plaintiffs must produce all of the documents located in the "envelope" as referred to in the 30 Year Email. These documents, provided by Papazoglou to Dionysios in and around the time when both were writing books identifying Princeton's possession—with Dionysios actually citing to Papazoglou—are highly relevant. The documents will demonstrate conclusively that Dionysios and Papazoglou were working together in locating manuscripts in and around 1989, and knew of Princeton's possession.

During meet-and-confer over this issue, Plaintiffs indicated that after speaking with the Metropolis' office, they were unable to locate these documents, and that Dionysios' private and personal effects were conveyed to his family upon his passing in 2005. This halfhearted explanation for not producing these important documents is unacceptable and inadequate. In "searching" for these documents, Plaintiffs never contacted their agent, Papazoglou—the author of the email, provider of the envelope documents, and person who not only located, but knows precisely what is in them and exactly where they were last located.

The Court has already held that Papazoglou is within Plaintiffs' control, and that he has aided Plaintiffs throughout this litigation—***including providing affirmative assistance with discovery***. [ECF No. 101 at 6.] Plaintiffs could reasonably locate and obtain these documents by speaking

15487470.v7



Honorable Rukhsanah L. Singh
U.S. Magistrate Judge
April 17, 2024
Page 16

with Papazoglou—just as they do when they need information that will assist their case—yet they have chosen not to do so. *See Bratka v. Anheuser-Busch Co., Inc.* (S.D. Ohio 1995) 164 F.R.D. 448, 463 ("If litigants are to have any faith in the discovery process, they must know that parties cannot fail to produce highly relevant documents within their possession with impunity. Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant documents.").

The Court should compel Plaintiffs to produce the envelope documents. If Plaintiffs do not, it is further evidence for why the Court should issue sanctions precluding Plaintiffs from offering evidence contradicting the fact that Papazoglou provided information to the Plaintiffs informing them of Princeton's possession of the manuscripts in the 1980s and 1990s.

***

Thank you for Your Honor's consideration of the aforementioned discovery issues.

Respectfully Submitted,

Steven A. Goldfarb

cc: All counsel, VIA ECF

15487470.v7